**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

May 24 2013, 9:20 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**P. JEFFREY SCHLESINGER**
Appellate Public Defender
Crown Point, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**RYAN D. JOHANNINGSMEIER**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| JAMES M. DURKIN, SR., | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 45A03-1207-CR-314 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE LAKE SUPERIOR COURT
The Honorable Salvador Vasquez, Judge
Cause No. 45G01-1004-FA-13

**May 24, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

James M. Durkin, Sr. ("Durkin") was convicted after a jury trial of robbery[1] as a Class A felony and sentenced to thirty years executed. He appeals, raising the following restated issues for our review:

I. Whether the trial court abused its discretion when it allowed security camera footage showing some of Durkin's illegal conduct to be admitted into evidence;

II. Whether sufficient evidence was presented to support Durkin's conviction for robbery as a Class A felony;

III. Whether the trial court erred when it admitted merchandise tags into evidence that were inside the pocket of a jacket that was previously admitted and not objected to by Durkin; and

IV. Whether Durkin's sentence was inappropriate in light of the nature of the offense and the character of the offender.

We affirm.

## FACTS AND PROCEDURAL HISTORY

On March 7, 2010, William Brittingham ("Brittingham") and Jason Michael ("Michael") were both working as loss prevention officers at Sears in the Southlake Mall in Hobart, Indiana. The loss prevention officers divided their time so that sometimes both officers would watch the cameras, sometimes one officer would be on the sales floor while the other watched the cameras, and sometimes both would be on the sales floor. Sears had over thirty security cameras located throughout the store that captured images of the cash registers, exits, and other areas in the store. The loss prevention officers could monitor the cameras from their office which contained monitors to observe the

---

[1] *See* Ind. Code § 35-42-5-1.

2

images captured by the cameras. The office was equipped with two large monitors on which the officers could watch selected views from different cameras. The office also had between eight and twelve smaller monitors. The images viewed on the larger monitors were recorded. The loss prevention officers received on-the-job training and approximately one week of computer training. Sears provided the officers with handcuffs, two-way radios, and identification cards. The primary goal for loss prevention officers was to recover stolen merchandise and return it to the sales floor for purchase.

During his shift on March 7, Brittingham was in the security office watching the sales floor from the monitors and observed a customer later identified as Durkin from a camera located in the men's cologne section. Men's cologne was a "high risk area" for the store. *Tr.* at 37. Durkin seemed "a little suspicious" and was "just not acting right." *Id.* Brittingham observed Durkin put a cologne bottle in his jacket pocket and then take two more bottles. By following him with the store cameras, Brittingham saw Durkin leave the men's cologne section and enter men's clothing. While in men's clothing, Durkin selected some merchandise, took off his jacket, put on some merchandise, and then put his jacket back on over the top. From two or three different cameras and angles, Brittingham observed Durkin select other merchandise, roll it up, and put it in his jacket pockets. Durkin also unpackaged the cologne, placed the bottles back in his jacket, and discarded the packaging in one of the clothing racks.

Brittingham then left the security office to watch Durkin from the sales floor while Michael remained to watch the security cameras. While out on the sales floor, Brittingham saw Durkin head toward an exit door. He walked past two cash registers and

toward a set of exit doors, which consisted of an inner set of doors, an empty space about eight to ten feet wide that serves as a breezeway, and then an outer set of doors that exited onto a sidewalk around the parking lot.

After Durkin passed all points of purchase and placed his hand on the first set of doors, Brittingham approached, identified himself as a Sears loss prevention officer, and asked Durkin to return to the store. Durkin turned back into the store, and Brittingham requested that Durkin put his hands on the wall, which Durkin did. However, Durkin was "real fidgety" and asked Brittingham to "please let me go, give me a break, just give me a break." *Id*. at 43. Brittingham asked Durkin to place his hands behind his back so that Brittingham could handcuff him, and Durkin "turned into" Brittingham and "started to fight." *Id*. Durkin attempted to get past Brittingham and exit the store. A struggle ensued, during which, Durkin pushed Brittingham into the first set of doors and "drove [him] through the second set of doors." *Id*. at 44. Once the two were outside, Durkin continued to push Brittingham, and Brittingham's ankle snapped. Brittingham then fell to the ground. Durkin went around Brittingham, but Brittingham grabbed Durkin's jacket, and Durkin fell on top of him. Durkin continued to fight, and Brittingham maintained his hold on Durkin's jacket. Brittingham was "screaming in agony for someone to help." *Id*. Durkin was able to pull loose from his jacket and flee the scene through the parking lot, leaving the jacket behind. A silver cell phone and bottles of cologne from the store were found inside the jacket.

When Michael saw Durkin pass the last point of sale without paying for any merchandise, he exited the loss prevention office. He ran from the office to the exit

4

doors, and when he approached the doors, he saw Brittingham lying on the ground. Michael pursued Durkin across the parking lot, but was not able to catch him.

An ambulance was called, and Brittingham was taken to the hospital. It was determined that two bones in his lower leg were broken. Brittingham had surgery to place screws and plates in his leg to hold the bones together. A second surgery was also required, and a third surgery was also possible in the future.

Hobart City Police Detective Stephen Houck ("Detective Houck") recovered the cell phone from Durkin's jacket. Although the service for the phone was no longer active, Detective Houck could view the stored phone numbers on the cell phone. The detective dialed a number labeled "kids," and a person answered who identified himself as "James Durkin, Jr." *Id.* at 213. That person gave Detective Houck the number for Durkin. Durkin returned the detective's call and denied any involvement with shoplifting or the attack on Brittingham. On March 19, 2010, Detective Houck showed Brittingham a photographic array, and Brittingham selected Durkin's picture as the man who shoplifted from Sears and attacked him.

The State charged Durkin with robbery as a Class A felony, robbery as a Class B felony, battery as a Class C felony, and theft as a Class D felony. A jury trial was held, at the beginning of which, the State dismissed the theft charge. At the conclusion of the trial, the jury found Durkin guilty of Class A felony robbery and Class B felony robbery and not guilty of Class C felony battery. The trial court only entered judgment on one count of Class A felony robbery and sentenced Durkin to thirty years executed. Durkin now appeals. Additional facts will be added as necessary.

## DISCUSSION AND DECISION

### I.     Admission of the Security Video Footage

The admission and exclusion of evidence falls within the sound discretion of the trial court, and we review the admission of evidence only for abuse of discretion. *Bradford v. State*, 960 N.E.2d 871, 873 (Ind. Ct. App. 2012) (citing *Wilson v. State*, 765 N.E.2d 1265, 1272 (Ind. 2002)). An abuse of discretion occurs where the decision is clearly against the logic and effect of the facts and circumstances. *Id.* (citing *Smith v. State*, 754 N.E.2d 502, 504 (Ind. 2001)). Even if the trial court's decision was an abuse of discretion, we will not reverse if the admission of evidence constituted harmless error. *Combs v. State*, 895 N.E.2d 1252, 1255 (Ind. Ct. App. 2008), *trans. denied*. Error is harmless if it does not affect the substantial rights of the defendant. *Id.* at 1258.

Durkin argues that the trial court abused its discretion when it admitted recorded video footage from the security cameras into evidence at trial. He specifically contends this was improper because the video recording was edited and was not a complete recording of what transpired in the Sears store. Durkin asserts that the edited recording did not show everything that occurred, including allegations that he took a jacket from the store, his walking past the cash registers, or any part of the altercation with Brittingham. Because his serious charges were based on such things, he claims that it was an abuse of discretion to admit an edited recording that did not include them.

Initially, we note that Durkin has failed to submit both the security footage that was admitted into evidence and the alleged relevant omitted footage to this court for our review. As a general rule, matters not contained in the record are not proper subjects for

review. *Herron v. State*, 808 N.E.2d 172, 178 (Ind. Ct. App. 2004), *trans. denied.* It is the duty of an appellant to present a record that is complete and that supports his claim of error so that an intelligent review of the issues may be made. *Turner v. State*, 508 N.E.2d 541, 543 (Ind. 1987). "An appellant must see that the record of proceedings contains all pleadings, papers, and transcripts of testimony which disclose and have any bearing on the error he is alleging." *Id.* Durkin's entire argument is that the trial court erred when it admitted the security camera footage, which was admitted as trial as State's Exhibit 5. Because of Durkin's failure to make sure that the security camera footage was a part of the record on appeal, this court is unable to review the merit of Durkin's argument, and it is waived.

Further, regardless of waiver, Durkin has failed to demonstrate how he was prejudiced as a result of the admission of an alleged edited video recording. Durkin does not present any evidence that the admitted security camera footage contained additional footage that was edited or deleted or that any additional footage even existed. Durkin cannot argue that the trial court failed to admit complete evidence when he cannot even demonstrate that the alleged omitted evidence existed. Durkin has not established that the trial court abused its discretion when it admitted the security camera footage into evidence.

## II. Sufficient Evidence

Our standard of review for sufficiency claims is well-settled. When we review a claim of sufficiency of the evidence, we do not reweigh the evidence or judge the credibility of the witnesses. *Parahams v. State*, 908 N.E.2d 689, 691 (Ind. Ct. App.

2009) (citing *Jones v. State*, 783 N.E.2d 1132, 1139 (Ind. 2003)). We look only to the probative evidence supporting the judgment and the reasonable inferences therein to determine whether a reasonable trier of fact could conclude the defendant was guilty beyond a reasonable doubt. *Id.* If there is substantial evidence of probative value to support the conviction, it will not be set aside. *Id.* It is the function of the trier of fact to resolve conflicts of testimony and to determine the weight of the evidence and the credibility of the witnesses. *Yowler v. State*, 894 N.E.2d 1000, 1002 (Ind. Ct. App. 2008).

Durkin argues that the evidence presented at trial was not sufficient to support his conviction for Class A felony robbery. He contends that it is not enough for the State to merely prove that the victim suffered a serious bodily injury; the State is required to present sufficient evidence to show that actions by the defendant caused the injury. Durkin alleges that, if Brittingham "sustained his injury by falling as he indicated to both the police and the medical professionals, this would not have been a natural and probable consequence" of Durkin's actions, and therefore, there was insufficient evidence to support his conviction. *Appellant's Br.* at 11.

In order to convict Durkin of Class A felony robbery, the State was required to prove beyond a reasonable doubt that he knowingly or intentionally took property from another person or from the presence of another person by using or threatening the use of force on any person, which resulted in serious bodily injury to any person other than Durkin. Ind. Code § 35-42-5-1. The responsibility for any serious bodily injury which occurs during the commission of a robbery rests with the defendant regardless of who

8

inflicts the injury as long as the injury is the natural and probable consequence of the events and circumstances surrounding the robbery. *Outlaw v. State*, 484 N.E.2d 10, 13 (Ind. 1985).

The evidence presented at trial showed that when Brittingham attempted to stop Durkin based upon suspicion of shoplifting, Durkin tried to get past Brittingham and exit the store. A struggle ensued, during which, Durkin pushed Brittingham into the first set of doors and pushed him through the second set of doors. Once the two were outside, Durkin continued to push Brittingham, and Brittingham's ankle snapped. Brittingham then fell to the ground. This testimony was sufficient to establish that Brittingham was injured from the pressure of being pushed by Durkin and then fell because his ankle had snapped. Durkin's argument that Brittingham fell and then broke his leg is merely an invitation to reweigh the evidence, which we cannot do. *Parahams*, 908 N.E.2d at 691.

However, even if Brittingham had first suffered a fall that resulted in a broken leg, sufficient evidence would still have existed to support his conviction. No intent to inflict the serious bodily injury is required to elevate robbery to a Class A felony. *Wethington v. State*, 655 N.E.2d 91, 96 (Ind. Ct. App. 1995) (citing *Stark v. State*, 489 N.E.2d 43, 48 (Ind. 1986) (proof that defendant intentionally caused bodily injury is not required to elevate robbery to Class A; if any injury arises as a consequence of the robbery, the offense is Class A)), *trans. denied*. Therefore, whether Brittingham first broke his leg and then fell or broke his leg as a result of the fall, sufficient evidence was presented to show that Brittingham suffered a serious bodily injury as a consequence of Durkin's use

of force while taking property. Sufficient evidence existed to support Durkin's conviction for Class A felony robbery.

### III. Admission of Merchandise Tags

The admission and exclusion of evidence falls within the sound discretion of the trial court, and we review the admission of evidence only for abuse of discretion. *Bradford*, 960 N.E.2d at 873. An abuse of discretion occurs where the decision is clearly against the logic and effect of the facts and circumstances. *Id*. In determining the admissibility of evidence, we will consider only the evidence in favor of the trial court's ruling and unrefuted evidence in the defendant's favor. *Sasser v. State*, 945 N.E.2d 201, 203 (Ind. Ct. App. 2011), *trans. denied*. Even if the trial court's decision was an abuse of discretion, we will not reverse if the admission of evidence constituted harmless error. *Combs*, 895 N.E.2d at 1255. Error is harmless if it does not affect the substantial rights of the defendant. *Id*. at 1258.

Durkin argues that the trial court erred when it failed to exclude from evidence at trial merchandise tags that were found inside the pocket of his jacket, which he left behind when he fled the Sears store. He contends that the fact that the existence of these tags had not been disclosed to him prior to the last day of trial was a violation of the discovery order and deprived him of the right to a fair trial. Durkin asserts that it was error for the trial court to fail to exclude the tags and any reference to them by the State. We disagree.

At trial, the State offered as State's Exhibit 11 a sealed evidence bag containing the jacket Durkin was wearing inside the store and left at the scene when he fled Sears.

10

Durkin did not object at that time. After the evidence had been admitted, the State informed the trial court that the jacket contained torn merchandise tags inside of the pockets. *Tr.* at 265. The deputy prosecutor told the trial court that she had not been aware that the torn tags were in the jacket pocket until the detective opened the sealed evidence bag at trial because the jacket had been sealed in the bag when checked into evidence after the crime and not opened prior to trial. *Id.* at 265-66. Durkin objected at that time to any reference by the State in its closing argument to the merchandise tags based on his "assumption" that if there had been anything in the pockets, the State should have disclosed it to him since other things, including a cell phone, had been found in the pockets and disclosed. *Id.* at 267. The trial court found that the evidence had already been admitted, and that the parties could reference the items found in the jacket pockets. *Id.* at 270-71.

When a defendant fails to make a contemporaneous objection to the admission of evidence at trial, however, any error is generally waived for purposes of appeal. *Orr v. State*, 968 N.E.2d 858, 860 (Ind. Ct. App. 2012). At trial, when the jacket that contained the merchandise tags was offered for admission, Durkin did not make any objection to its admission. The jacket was then admitted and published to the jury. In fact, the trial court noted, "[w]e are talking about an item that's been admitted into evidence, examined, testified to, reviewed by the defense prior to admission, and if I'm not mistaken, I believe there was no objection to the admission of this item." *Tr.* at 270. Durkin had therefore waived this issue for review due to his failure to make a contemporaneous objection

11

when the tags that were contained in State's Exhibit 11, the jacket, were admitted into evidence.

Waiver notwithstanding, the trial court properly allowed reference to the merchandise tags in the State's closing argument. Durkin contends that the fact that the failure to disclose the existence of the tags prior to the last day of trial was a violation of the discovery order. The trial court here did not find that the State committed any discovery violation and actually determined that Durkin should have examined the jacket prior to its admission. *Id.* The trial court concluded that both sides were responsible for not discovering the tags earlier, "why it wasn't checked by either of you is surprising as well." *Id.* at 271. We, therefore, conclude that no discovery violation occurred, and the trial court did not err in allowing the State to refer to the merchandise tags.

### IV. Inappropriate Sentence

"This court has authority to revise a sentence 'if, after due consideration of the trial court's decision, the court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender.'" *Spitler v. State*, 908 N.E.2d 694, 696 (Ind. Ct. App. 2009) (quoting Ind. Appellate Rule 7(B)), *trans. denied*. Although Indiana Appellate Rule 7(B) does not require us to be extremely deferential to a trial court's sentencing decision, we still must give due consideration to that decision. *Delao v. State*, 940 N.E.2d 849, 852-53 (Ind. Ct. App. 2011) (citing *Patterson v. State*, 909 N.E.2d 1058, 1062-63 (Ind. Ct. App. 2009)), *trans. denied*. We understand and recognize the unique perspective a trial court brings to its sentencing decisions. *Id.* at 853. The defendant bears the burden of persuading this court that his sentence is inappropriate. *Id.*

12

Durkin argues that his advisory thirty-year sentence was inappropriate in light of the nature of the offense and the character of the offender. Regarding his character, he contends that, although he had a significant criminal record, all of his convictions were for retail theft, and he had no convictions for crimes involving violence. As to the nature of the offense, Durkin asserts that the crime was a "shoplifting gone bad" and "not a robbery where a gun or other weapon was used to threaten someone to surrender money or other property." *Appellant's Br*. at 13. He, therefore, claims that his sentence should be revised to the minimum sentence for a Class A felony.

The "nature of the offense(s)" portion of the appropriateness review concerns the advisory sentence for the class of crimes to which the offense belongs. *Reyes v. State*, 909 N.E.2d 1124, 1128 (Ind. Ct. App. 2009) (citing *Anglemyer v. State,* 868 N.E.2d 482, 494 (Ind. 2007), *clarified on reh'g,* 875 N.E.2d 218 (Ind. 2007)). Therefore, the advisory sentence is the starting point in the appellate court's sentence review. *Id*. (citing *Anglemyer,* 868 N.E.2d at 494). The "character of the offender" portion of the sentence review involves consideration of the aggravating and mitigating circumstances and general considerations. *Id*. (citing *Williams v. State,* 840 N.E.2d 433, 439-40 (Ind. Ct. App. 2006)).

Here, the trial court sentenced Durkin to thirty years executed for his Class A felony robbery conviction. The advisory sentence for a Class A felony is thirty years, with a sentencing range from twenty to fifty years. Ind. Code § 35-50-2-4. "Since the advisory sentence is the starting point our General Assembly has selected as an appropriate sentence for the crime committed, the defendant bears a particularly heavy

burden in persuading us that his sentence is inappropriate when the trial court imposes the advisory sentence." *Fernbach v. State*, 954 N.E.2d 1080, 1089 (Ind. Ct. App. 2011) (citing *Golden v. State,* 862 N.E.2d 1212, 1216 (Ind. Ct. App. 2007), *trans. denied*), *trans. denied.*

As to the nature of the offense, Durkin took several items of merchandise from the Sears store, and when Brittingham confronted him and tried to handcuff him, Durkin started to fight Brittingham. As Durkin attempted to get past Brittingham and exit the store, a struggle ensued, during which Durkin pushed Brittingham into the first set of doors and through the second set of doors. Once the two were outside, Durkin continued to push Brittingham, and Brittingham's ankle snapped. Brittingham then fell to the ground. It was determined that two bones in Brittingham's lower leg were broken, and he had to have two surgeries, and a third surgery was also possible in the future.

Regarding Durkin's character, the evidence showed that Durkin was employed full-time at the time of the instant offenses and provided support for his ex-wife, who lived with him, and their three children. The evidence also established that he had an extensive criminal record, which included multiple misdemeanor and felony convictions. Durkin had over twelve arrests, most for retail theft, and eight convictions for either theft or retail theft. While on bond for the present offenses, Durkin was arrested for operating while intoxicated. Durkin has not carried his burden to prove that his thirty-year advisory sentence was inappropriate in light of the nature of the offense and the character of the offender. Affirmed.

VAIDIK, J., and PYLE, J., concur.

14